## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| B.Z. on behalf of themselves and all others similarly situated,<br><br>              Plaintiff,<br><br>    v.<br><br>SHENZHEN SMOORE TECHNOLOGY COMPANY, LTD.<br><br>SMOORE INTERNATIONAL HOLDINGS LIMITED<br><br>JUPITER RESEARCH, LLC<br><br>3WIN CORPORATION,<br><br>CB SOLUTIONS, LLC d/b/a CANNA BRAND SOLUTIONS<br><br>GREENLANE HOLDINGS, INC.<br><br><br>           Defendants. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff B.Z. on behalf of themselves and Classes of indirect purchasers of CCELL-branded ("Ceramic Cell") closed cannabis oil vaporizers systems and components sold by Defendant Shenzhen Smoore Technology Co. Ltd. and owned by Smoore International Holdings Limited (collectively "Smoore") or its authorized distributors—Jupiter Research LLC ("Jupiter"); Greenlane Holdings, Inc. ("Greenlane"); 3Win Corp. ("3Win"); CB Solutions, LLC d/b/a Canna Brand Solutions ("CB Solutions," and together with Jupiter, Greeenlane/KushCo, and 3Win, the ("Distributor Defendants") and along with Smoore collectively "Defendants")), upon personal knowledge as to themselves and their own actions, and upon information and belief as to

Defendants' actions and omissions, including the investigation of their counsel, and seeking actual damages, treble damages, restitution, disgorgement, declaratory and injunctive relief, pre- and post-judgment interest, and reasonable costs and attorneys' fees, allege the following Class Action Complaint (the "Action" or "Complaint").

## I.     INTRODUCTION

1.      Millions of Americans use recreational or medicinal cannabis and consume cannabis products in at least thirty-nine (39) states where consumption of medicinal or recreational cannabis is legal. A primary means of consuming recreational cannabis is through vaporization or "vaping" which is presumptively a much healthier, simpler, and more discreet alternative to the traditional smoking of cannabis.

2.      Vaporization involves the heating of hash oil or cannabis plant material to release aerosolized cannabinoids, including tetrahydra cannabinol ("THC") and cannabidiol, which is often combined with water vapor and inhaled.

3.      Cannabis users typically use one of two similar devices for vaporizing cannabis: (1) closed cannabis oil vaporizing systems that employ a reusable electronic pen that combines with a cartridge and mouth piece that is filled with cannabis oil or extract; or (2) "all-in-one" devices, which include both parts in one device.

4.      As much as 85-90% of all cannabis oil vaporization systems are of the first type—systems that contain a reusable electronic pen, where additional cannabis filled cartridges can be purchased separately by the end-consumer. The vape cartridge and the remainder of the vape system or "battery" can be sold together or separately to end consumers.

5.      Manufacturers of closed cannabis oil vaporization devices do not produce cannabis oil. Manufacturers sell the devices or just the unfilled cannabis vape cartridges to wholesale distributors or directly to cannabis oil producers that fill the cartridges with cannabis oil and then sell the devices with cannabis oil to retailers and consumers.

6.      Defendant Smoore is a Chinese company that manufactures and distributes empty cannabis vape cartridges, mouth pieces, trays of deformable material with voids for holding

cartridge bodies, trays of deformable material with voids for holding mouthpieces, and coverings (the "Products"). The Products can be sold disassembled or preassembled to wholesale distributors or directly to cannabis oil producers.

7.      The manufacture and wholesale distribution of unfilled vape cartridges for closed cannabis oil vaporization systems each constitutes a separate but relevant market for antitrust purposes (the "Relevant Markets").

8.      Smoore is a monopolist in the manufacture of the Products for the United States market and produces as much as 80% of the closed cannabis oil vaping devices in the United States and sells the Products directly to cannabis producers and wholesale distributors, including to the Distributor Defendants.

9.      Smoore is both a vertical supplier of empty vape cartridges to the Distributor Defendants and a horizontal competitor with the Distributor Defendants at the distributor level. Smoore's dominant market share in the manufacture of closed cannabis oil vaping devices essentially requires that wholesale distributors work with Smoore to obtain the Products to sell to cannabis producers. There is not a meaningful alternative to purchasing cannabis oil cartridges directly from Smoore or through one of the Distributor Defendants.

10.     Smoore and the Distributor Defendants entered an anticompetitive scheme to charge cannabis oil producers and other consumers of the Products supracompetitive prices for closed cannabis oil vaporization systems. As part of this scheme, Smoore and Distributor Defendants entered into agreements that created a minimum price floor for the Products, agreed that Distributor Defendants would only sell Smoore's Products and not those of Smoore's competitors, agreed to allocate markets by not competing for one another's customers, and agreed to share price and customer information with one another in violation of Section 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3) and in violation of state antitrust laws.

11.     In particular, Smoore and Distributor Defendants entered agreements in restraint of trade that: (i) forbid Distributor Defendants from selling competing products to Smoore's Products; (ii) prevent Distributor Defendants from selling Smoore's Products downstream above

a designated price floor; (iii) prevent Distributor Defendants from selling Smoore's Products to Smoore's competitors; and (iv) require Distributor Defendants to post a security deposit that is used to penalize Distributor Defendants if they do not comply with the other anticompetitive provisions of the distribution agreement.

12. Smoore ensured compliance with the anticompetitive agreements by requiring the Distributor Defendants to share confidential customer names and price information with one another. Smoore also ensured compliance with this anticompetitive price fixing and market allocation scheme by requiring Distributor Defendants to report any violations of the agreement by other Distributor Defendants. If a violation was substantiated, Smoore would deduct money from the violating distributor's security deposit as a penalty to discipline their behavior and ensure that they played their part in the anticompetitive scheme.

13. Jupiter is the largest wholesale distributor of unfilled vape cartridges for closed cannabis oil vaporization systems in the United States accounting for 40–50% of all sales of closed cannabis oil vaporization systems in the United States. Greenlane is the second largest with roughly 25–30% of the wholesale distribution market. Between the two of them alone, they control 65–80% of the wholesale distribution market in the United States. Combined with CB, 3Win, and Smoore, they control nearly all of the wholesale distribution market for closed cannabis oil vaporization systems in the United States.

14. It is evident that Defendants' anticompetitive agreements not to compete and maintain artificially high prices result in substantial foreclosure of competition throughout the wholesale distribution market. Accordingly, Cannabis oil producers and other consumers of the Products are almost entirely dependent on the Defendants for their supply of closed cannabis vaporization systems.

15. Defendants' agreements not to compete, pricing restrictions, and allocation of customers constitute a horizontal price fixing and market allocation scheme. Defendants implemented this anticompetitive scheme through several in-person meetings and through employee training that directed employees of Distributor Defendants to follow the minimum price

4

restraints and not to solicit or compete for customers of Smoore or of other Distributor Defendants.

16.     Smoore's anticompetitive distribution agreements and restrictions on the Distributor Defendants prevent price competition in the wholesale distribution market by depriving distributors of alternate sources of supply, preventing potential entrants or competitors in the manufacturing market from accessing wholesale distribution channels, locking Distributor Defendants into exclusively selling only Smoore's products, preventing Distributor Defendants from competing directly with Smoore in the manufacture of the Products, preventing Distributor Defendants from competing for Smoore's customers, and preventing Distributor Defendants from competing with one another or with Smoore on prices.

17.     The primary effect of the anticompetitive price fixing and market allocation scheme is to restrain competition among the Distributor Defendants and between the Distributor Defendants and Smoore when Smoore distributes its Products directly to cannabis oil producers. Accordingly, the primary effect of the agreement is horizontal in nature and a *per se* violation of Section 1 of the Sherman Act.

18.     Defendant Smoore's distribution agreements with the Distributor Defendants are also anticompetitive and exclusionary under Section 2 of the Sherman Act (15 U.S.C. § 2) and state antitrust laws. Smoore's monopoly over the manufacture of cannabis vape cartridges for sale in the United States enables it to orchestrate its anticompetitive scheme. The anticompetitive price fixing and market allocation scheme requires the Distributor Defendants to act against their independent self-interest. No rational distributor would agree to refrain from price competition or refrain from attempts to win business from its rivals absent an agreement not to compete. Smore uses its monopoly position in the supply of closed cannabis vaping systems to discipline Distributor Defendants if they do not comply with Smoore's anticompetitive scheme.

19.     Cannabis producers and other consumers of the Products lack a meaningful alternative to the Defendants' chokehold over the supply of unfilled vape cartridges for closed cannabis oil vaping systems. The exclusivity provisions of the distribution agreement guarantee Smoore's access to its customers at the price Smoore chooses and protects Smoore's monopoly in

the manufacture of cannabis vape cartridges for the United States market from disruption by potential entrants.

20.    Preventing the largest distributors of its products from working with other potential suppliers ensures that competing products are not introduced to cannabis oil producing customers or retail customers of Smoore or of the Distributor Defendants. As such, rival suppliers of vaping cartridges are excluded from the market and can only access the market through smaller less reputable distributors that do not have access to the largest cannabis oil producers.

21.    Defendant Smoore also defends its primary monopoly in the manufacture and sale of cannabis vaping cartridge Products for the United States by filing frivolous patent litigation against would-be competitors in the manufacture and sale of competing cannabis vape cartridge products for the United States. Smoore's intent in filing sham litigation is to exclude rival cannabis vaping cartridge manufacturers from entering the market.

22.    Plaintiff brings this lawsuit against Smoore and Distributor Defendants on behalf of themselves and all other similarly situated indirect purchasers under Sections 1, 2, and 3 of the Sherman Antitrust Act, pursuant to Sections 4 and 16 of the Clayton Act, and applicable state antitrust laws.

23.    Plaintiff seeks actual damages, treble damages, restitution, disgorgement, declaratory relief, injunctive relief, pre- and post-judgment interest, as well as reasonable costs and attorney's fees associated with the prosecution of this Action.

## II.    JURISDICTION AND VENUE

24.    Plaintiff brings this Action for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, to remedy violations of Sections 1, 2 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2 and 3, as well as for damages under various state antitrust laws.

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(d) 1337(a), and 1367.

26.    This Court has personal jurisdiction over the litigants pursuant to 15 U.S.C. § 22 because, *inter alia*, each Defendant either directly or through the ownership and/or control of its

6

subsidiaries: (a) directed their business activities toward this District, (b) transacted for the distribution or sale of Smoore's CCELL products throughout the United States and in this District; (c) had substantial contacts with this District; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in or located in this District, including Plaintiff. Plaintiff paid unlawful overcharges to Defendants and suffered antitrust injury in this District.

27.     Venue is proper in this judicial district pursuant to 15 U.S.C §§ 15, 22 and 28 U.S.C. § 1391(b) and (c), because a substantial portion of the affected interstate trade and commerce was carried out in this District and/or one or more Defendants resides in and/or transacts business in this District.

28.     Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade in the United States and throughout this District.

29.     The anticompetitive conduct alleged herein has been directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States and this District. Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

30.     Further, because this case arises under the Sherman Act, this Court has personal jurisdiction over each Defendant based on its contacts with the United States as a whole.

**III.     PARTIES**

**A.     Plaintiff B.Z.**

31.     Plaintiff B.Z. is a citizen and resident of this District, in Prospect Heights, Illinois.

32.     As a resident of Illinois, Plaintiff B.Z. is legally allowed to purchase and/or consume vaporized cannabis oil for his personal individual, recreational or medicinal use. Plaintiff B.Z. has purchased Products at a licensed dispensary during the Class Period (January 1, 2020

through the present day).

33.     Each of these products represents an indirect purchase from Defendants. Throughout the Class Period, Plaintiff B.Z. has spent thousands of dollars on cannabis vaporizers, including the brands which utilize Smoore's CCELL products and technology.

34.     Plaintiff B.Z. paid supracompetitive prices for cannabis products as a result of Defendants' conduct as alleged herein.

**B.     Defendant Smoore International Holdings Limited**

35.     Smoore International Holdings Limited, either a parent company, subsidiary, or affiliate to Shenzhen Smoore Technology Company, Limited, is a corporation organized under the laws of the Cayman Islands, having its principal place of business located at Block 16 Dongcai Industry Park, Gushu Village, Bao-an District, Shenzhen, China.

36.     Smoore Holdings is a publicly traded corporation listed on the Hong Kong Stock Exchange.

37.     Smoore Holdings is the parent corporation of Defendant Shenzhen Smoore, which is its wholly owned subsidiary.

38.     There exists, and at all times herein mentioned existed, a unity of ownership between Defendants Smoore Holdings and Shenzhen Smoore and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others. Adherence to the fiction of the separate existence of Defendants Shenzhen Smoore and Smoore Holdings, would, under the circumstances set forth in this complaint, sanction fraud, or promote injustice.

39.     On information and belief, Defendant Smoore Holdings directs, oversees, and controls virtually all aspects of Defendant Shenzhen Smoore's day-to-day business operations, including pricing strategy, distributor selection, marketing, sale, research and development, contract negotiations, product manufacture and design for the CCELL products at issue.

40.     To that end, Smoore Holdings and Shenzhen Smoore share key executive

leadership and corporate decision makers as evidenced by their public statements.

41.     For example, in 2020, Smoore Holdings published its global share offering presentation in connection with its listing on the Hong Kong Stock Exchange. In that report, Smoore Holdings identified its Executive Directors, many of which were also corporate officers, executives, managers, or directors of Defendant Shenzhen Smoore. For example, Chen Zhiping the chairman of Smoore Holdings serves as the "general manager" of Smoore Shenzhen and is also the founder of Smoore Shenzhen. Moreover, Xiong Shaoming is executive Director and the vice general manager for Smoore Holdings and has served as the Vice General Manager of Smoore Shenzhen since 2009. Smoore Holdings' global share presentation also indicated that Mr. Chen and Mr. Xiong were collectively entitled to exercise and control approximately 36.80% of the entire issued share capital for Smoore Holdings.

### C.     Distributor Defendant Jupiter Research, LLC

42.     Defendant Jupiter Research, LLC is a limited liability company with its principal place of business located in Phoenix, Arizona.

43.     Jupiter is one of four companies that distribute Smoore's products throughout the Relevant Market for wholesale distribution. Jupiter first introduced CCELL technology for closed cannabis oil vaporization systems to the United States market in 2016 and shortly thereafter entered into anticompetitive distribution agreements with Smoore.

### D.     Distributor Defendant 3Win Corporation

44.     Defendant 3Win is a corporation with its principal place of business located in Tempe, Arizona.

45.     3Win is one of four companies that distribute Smoore's products in the Relevant Market for wholesale distribution. According to 3Win, it is the "preferred" wholesale distributor of Smoore's CCELL vape products.

46.     Upon information and belief, 3Win Corporation entered into Smoore's distribution agreements with the aforementioned anticompetitive clauses as late as 2019, though perhaps

significantly earlier.

        **E.    Distributor Defendant CB Solutions LLC**

      47.    Defendant CB Solutions LLC (doing business as "Canna Brand solutions") is a limited liability company formed under the laws of the State of Washington with its principal place of business located in Everett, Washington.

      48.    On information and belief, Daniel Allen and Kevin C. Ross are the only members of CB Solutions, and each of them is domiciled in the State of Washington.

      49.    CB Solutions is one of four companies that Smoore identifies on its website as authorized to distribute Smoore's products in the Relevant Market for wholesale distribution. On its website, CB Solutions holds itself out to be "an Official CCELL Distributor."

      50.    CB Solutions entered into anticompetitive distribution agreements with Smoore as early as 2017.

        **F.    Distributor Defendant Greenlane Holdings, Inc.**

      51.    Defendant Greenlane Holdings, Inc. is a corporation with its principal place of business located in Boca Raton, Florida.

      52.    Founded in 2005, Greenlane is publicly traded under the ticker "GNLN" on the NASDAQ. According to Greenlane, "Greenlane operates as a powerful house of brands and is the premier global platform for the development and distribution of premium cannabis accessories, packaging, vape solutions, and lifestyle products… Greenlane is a partner of choice as a third-party brand accelerator and omni-channel distribution platform for many of the industry's leading multi-state operators, licensed producers, and brands."

      53.    Greenlane is one of four companies that distribute Smoore's products in the Relevant Market for wholesale distribution. According to Greenlane, Greenlane "ha[s] enjoyed a strong partnership with Smoore (via [Greenlane's] CCELL distribution business" since 2018.

      54.    Greenlane entered into anticompetitive distribution agreements with Smoore as early as 2018.

## IV.    AGENTS AND CO-CONSPIRATORS

55.    The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of Defendants' business or affairs.

56.    The officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals. As set forth in detail herein, the agents held themselves out as acting for or on behalf of their respective principals. The agents acted within the scope of their explicit and apparent authority, binding their respective principals.

57.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs. Such officers include but are not limited to those executives who participated in at least one in-person meeting in furtherance of the conspiracy:

(a)    Smoore: Joe Strain (VP of CCELL) and Shallyn Lin (Head of North American Sales);

(b)    Jupiter: Mark Scatterday (CEO), Joseph Barberio (COO), and Paul Stremcha (Head of Sales);

(c)    3Win: Chris Sinacori (CEO) and Eric Newman (Chief Sales Officer);

(d)    KushCo: Nick Kovacevich (CEO), 18 Jim McCormick (CFO), Jason Manasse (VP of Business development), and Jason Vegotsky (President/VP of Sales); and

(e)    CB Solutions: Danny Allen (CEO).

58.    Individuals alleged to have engaged in misconduct in violation of the laws listed herein are alleged to have done so on behalf of all members of their corporate family. Individuals within the companies and customers did not know or did not distinguish between the corporate

affiliations of different individuals.

59.     Various persons, businesses, or fictitious persons not named as Defendants herein participated as co-conspirators in the conspiracy alleged herein and may have performed acts and made statements in furtherance thereof.

## V.     FACTUAL ALLEGATIONS

60.     California became the first state to allow the consumption of cannabis for medicinal purposes in 1996.  Since then, the trend of legalization for medicinal and recreational purposes has accelerated and the demand for legal cannabis and related products has grown exponentially. Today twenty-four states have legalized recreational cannabis, and another fifteen states have legalized medical cannabis.

61.     The current landscape of state-by-state cannabis consumption laws appear as follows:[1]



62.     The recent change in policy toward cannabis and cannabis related products in at least thirty-nine (39) states over the past twenty-four years resulted in a rapidly expanding market for cannabis production with many new entrants. The expansion of legal cannabis products led to

---

[1] https://www.covasofware.com/hs-fs/hubfs/2025/Blog/Where-Is-Cannabis-Legal-Map-2025.png

significant increases in demand for and consumption of cannabis for both medicinal and recreational purposes. As result, newer technologies such as vaporization emerged to provide a healthier, convenient, and more discrete experience.

### A. Jupiter and Smoore Launch CCELL Technology and Establish Distribution Network in the United States.

63.    Initially, vaporization technology was created for nicotine, but nicotine vaporization products were liquid based and not compatible with cannabis oil. In contrast to nicotine liquid, cannabis oil is viscous and less stable. As such, nicotine vaporizer manufacturers could not easily leverage this technology into the market for vaporizing cannabis oil.

64.    In 2016, Jupiter entered the market for the vaporization of cannabis oil with CCELL vaporization technology that it developed. Cannabis consumption in the United States has skyrocketed in-part due to the popularity as well as the relative and simplicity ease by which of consumption that cannabis oil vaporizers employing CCELL technology provides.

65.    Jupiter's patent for CCELL technology actually predates Smoore's CCELL patent for the technology, but the two companies share a close relationship and even share a research development facility in Arizona while Smoore controls manufacturing overseas in China. In November 2016, 3Win joined Smoore as an authorized distributor of cannabis vape cartridges with CCELL technology. In 2017 CB Solutions also became an authorized distributor of CCELL vape cartridges. In 2018 KushCo (now Greenlane) also became an authorized distributor of CCEL vape cartridges.

### B. The Cannabis Oil Vaporization Market

66.    The cannabis oil vaporization supply chain consists of: (i) vape hardware manufacturers like Smoore; (ii) wholesale distributers of vape hardware like the Distributor Defendants; (iii) cannabis producers; (iv) retail distributers of vape hardware that is filled with cannabis oil; (v) retailers; and (vi) consumers.

67.    Smoore is the dominant manufacturer of cannabis oil vape hardware sold in the United States. Specifically, Smoore is a monopolist in the market for unfilled vape cartridges for

closed cannabis oil vaporization systems. Although other manufacturer's such as NLV have attempted to enter the U.S. market, Smoore's anticompetitive conduct prevents any meaningful competition in this market.

68.     The Distributor Defendants along with Smoore are the dominant wholesale distributors in the wholesale distribution market for unfilled vape cartridges for closed cannabis oil vaporization systems. Although other smaller distributors of cannabis vape hardware may exist, Defendants likely control well above 65% of the wholesale distribution market.

69.     Cannabis oil producers and retail distributors purchase unfilled vape cartridges for closed cannabis oil vaporization systems from the Defendants and fill those cartridges with cannabis oil to be sold to retailers. Cannabis oil producers and retail distributors are direct purchasers of Smoore's Products. Although these direct purchasers pay supracompetitive prices for Smoore's Products they pass on these overcharges to retailers and end-consumers. Ultimately it is the end consumer of closed cannabis oil vaporization systems that are harmed by Defendant's illegal and anticompetitive conduct.

## VI.    RELEVANT MARKETS

### A.    The Manufacture and Wholesale Distribution of Cannabis Vape Cartridges

70.     The manufacture and wholesale distribution of unfilled vaporizer cartridges for closed cannabis oil vaporizer systems or the Products are a relevant markets for antitrust purposes. Smokable cannabis, edible cannabis, and open cannabis vaporization systems are not substitutes for closed cannabis vaporization systems.

71.     Cannabis, refers to the dried leaves, flowers, stems and seeds from the Cannabis sativa L plant. The plant contains the chemical THC and other similar compounds. Extracts can be derived from the cannabis plant to create cannabis oil used in vaporization. Cannabis extracts can also be ingested as an "edible" or smoked through ignition of waxes, resins, or the plant itself. In contrast to smoking cannabis, vaporization of cannabis does not produce burning or smoking, rather it heats cannabis oil mixed with water to produce vapor that is generally believed to

constitute a healthier alternative to smoking cannabis. As such, smoking or ingesting cannabis is not a substitute for cannabis oil vaporization.

72.     Cannabis vaporizers are either "open" or closed. Open cannabis vaporization systems require the consumer to purchase the cannabis separately from the device.  Consumers that prefer to purchase cannabis material at the same time as the cannabis device do not wish to produce cannabis separately.

73.     In contrast, the closed cannabis vaporizer system requires the purchase of both the cannabis product and the reservoir at the same time—which is prefilled by the cannabis product manufacturer. Open cannabis vaporizer systems that rely on solid form of cannabis such as resin or dried plant material are not interchangeable or substitutable with closed cannabis oil vaporizer systems or unfilled cannabis vape cartridges.

74.     Cannabis oil used in closed cannabis oil vaporizer systems are distinct from other forms of consuming cannabis products. Closed cannabis oil vaporizer systems are purchased by the end consumer and include a vape cartridge filled with cannabis oil and a battery charged electronic devices that heats the oil for vaporization. Replacement cannabis vaporization cartridges filled with cannabis oil can also be sold separately.

75.     Manufacturers and wholesale distributors of closed cannabis oil vaporizer systems sell the vaporization systems to cannabis producers or retail distributors that fill the cartridges with cannabis oil and sell them to retailers or end consumers.

76.     Cannabis vape cartridges generally consist of a mouthpiece, a reservoir, atomizer assembly. They can be sold with or without an electronic device or "battery" but need the presence of a battery to heat the cannabis oil.

77.     Of the closed cannabis oil vaporizer systems, there are two different kinds: (1) all-in-one devices and (2) vape cartridge pens. The latter includes a reusable electronic "pen" with a mouthpiece that attaches to a cartridge filled with cannabis oil.  Some cannabis pens are also "all-in-one" devices, which include all the component parts, including the cannabis oil in one piece.

78.     Examples of an all-in-one, disposable cannabis vaporizer pen appear as follows:[2]



79.     This image is of a finished cannabis oil vaporizer product which incorporates a closed cannabis oil vaporizer system product and cannabis oil.

80.     An example of a reusable cannabis oil vaporizer appears as follows:[3]



---

[2] https://www.ccell.com/all-in-ones

[3] https://www.ccell.com/cartridge; https://www.ccell.com/battery

81.     All-in-one devices are generally regarded as a different product than the reusable electronic pens by consumers because all-in-one devices are disposable and the non-cannabis components of the pen cannot be reused after all the cannabis oil or extract in the cannabis cartridge attached to the pen is entirely consumed.

82.     As much as 85–90% of all cannabis oil vaporization systems—systems that contain a reusable electronic pen, where additional cannabis-filled cartridges can be purchased separately by the end-consumer. That is, only 10–15 % of cannabis vaporization systems are of the all-in-one variety.

83.     The closed vaping system industry and the combustible and edible cannabis industries regard closed vaping systems as different and separate from combustible or edible cannabis products, as does the vaping and solid cannabis consuming public, which forms a distinct set of customers to the sets for combustibles or edibles, respectively.

84.     Closed vaporizer products have the peculiar characteristic and use of producing less heat and smoke than combustible cannabis products, and often different and/or lesser odors as well. They have the peculiar characteristic of being inhalable, in relation to edible cannabis products. Distinct production facilities are used by combustible and edible cannabis producers, compared with vaporizer system manufacturers. There are distinct prices and pricing mechanisms for closed cannabis oil vaporizer systems, as compared with either combustible cannabis products, edible cannabis products, etc. The consuming public for such systems are sensitive to price changes, and patronize specialized vendors for their supplies.

**B.      Defendant Manufactures and Distributes Products in the Relevant Product Markets.**

85.     Smoore manufactures and distributes unfilled cannabis vape cartridges for closed cannabis oil vaporization systems for the United States market.

86.     In addition to cannabis vape cartridges, Smoore also distributes cannabis cartridge packaging and capping systems for filling and capping oil-vaporizing [cannabis] cartridges.

87. Smoore's Products include:

    a. A first tray of deformable material with voids for holding cartridge bodies;

    b. The cannabis oil cartridge (without any cannabis oil or extract in it);

    c. A cover that conceals the first tray;

    d. A second tray with voids for holding mouthpieces; and

    e. The mouthpiece.

88. Each of these products are used in conjunction with each other to enable cannabis oil producers or retail distributors to fill Smoore's Products with cannabis oil extract to develop a product fit for consumption by end-users.

89. Smoore sells wholesale vaporizer hardware directly to cannabis oil and extract producers who then sell those closed cannabis oil system devices to retail outlets (like licensed dispensaries) and directly to consumers, depending on jurisdiction.

90. In another case involving Defendant Smoore, a market that defined Smoore's Products as a separate market for antitrust purposes survived a motion to dismiss using the factors identified in *Brown Shoe*. *Brown Shoe Co. v. United States,* 370 U.S. 294 (1962). See *Shenzhen Smoore Tech. Co., Ltd. v. Next Level Ventures, LLC and Advanced Vapor Devices LLC*, Case No. 2:22-cv-07646-AB-AGR, 2024 U.S. Dist. LEXIS 237117, at *16 (C.D. Cal. mot. to dism. counterclaims denied in part, Dec. 4, 2024) (under *Brown Shoe,* a "definition of closed cannabis oil vaporizer systems and components is sufficient at the pleadings stage because it provides notice … that closed systems are not reasonably interchangeable with open systems or other means of cannabis delivery").

**C. The Relevant Geographic Market is the United States.**

91. The relevant geographic market for closed cannabis oil vaporizer systems is the entirety of the United States. Cannabis is legal for recreational or medicinal consumption in at least 39 states in the United States. Although the cannabis market in each of these states is local to some extent, the market for unfilled vape cartridges for closed cannabis oil vaporizer products is an input

to the final product purchased by the consumer that may contain cannabis oil. Accordingly, the market is a nationwide market. The legal status of cannabis oil in a particular state might affect the demand or the size of the market for the products, but it does not affect whether or not Defendants can sell their particular product in that state. For example, a wholesale distributor can import unfilled cannabis vape cartridges or products into a state where cannabis is illegal and ship the product to cannabis producers in states where cannabis is legal.

## VII. MONOPOLY POWER

### A. Direct Evidence of Smoore's Monopoly Power

92.    Defendant Smoore exerts its monopoly power in the manufacturing and wholesale distribution markets for unfilled vape cartridges for closed cannabis oil vaporizer systems by prohibiting competing manufacturers from distributing their products through the largest wholesale distributors in the United States, by prohibiting wholesale distributors from competing for one another's customers or competing on price, and by extracting supracompetitive prices from cannabis producers, retail distributors, and end-consumers.

93.    Smoore's market power enables it to unilaterally set prices for its Products and exclude competition by locking wholesale distributors and cannabis producers into buying its products to the exclusion of would be competitors in the market for manufacturing unfilled vape cartridges for closed cannabis oil vaporization systems. The supracompetitive prices it and other participants in the scheme charge are higher than they would otherwise be but for the illegal anticompetitive conduct. In addition to higher prices, output and innovation are also decreased.

94.    Smoore's dominant market share gives the Distributor Defendants two options: either participate in Smoore's anticompetitive scheme (including participating in horizontal price fixing, market allocation, and exclusive dealing) or face the consequences of not being able to do business with Smoore, risking the loss of an essential source of supply that represents as much as 80% of the market for closed cannabis oil vaporization systems in the United States.

**B.      Indirect Evidence of Smoore's Monopoly Power**

**1.      *Defendants control the manufacture and wholesale distribution markets for cannabis oil vape cartridges in the United States.***

95.      Smoore produces between 70–80% of the closed cannabis oil vaping devices in the and is the largest supplier of unfilled cannabis oil vape cartridges in the United States. Further, Smoore's anticompetitive distribution agreements with the Distribution Defendants likely affect substantially more than 65% of the wholesale distribution market.

96.      Smoore and the Distributor Defendants are practically the exclusive wholesale suppliers of unfilled vape cartridges for close cannabis oil vaporization systems in the United States. There are no meaningful alternatives for cannabis oil producers or retail distributors to acquire the Products other than from Defendants' illegal and anticompetitive scheme to fix prices. The result is that end-consumers pay more for closed cannabis oil vaporization systems.

97.      Smoore's market share in the market for the manufacture of unfilled vape cartridges for closed cannabis oil vaporization systems creates a strong presumption that it has monopoly power in the manufacture of the Products for consumption in the United States.

98.      Defendants' share of the wholesale distribution market for the Products is strong evidence that their anticompetitive conduct results in substantial market foreclosure in the United States market.

**2.      *The Relevant Markets have high barriers to entry.***

99.      The market for the manufacture of unfilled vape cartridges for closed cannabis oil vaporization systems is marked by high barriers to entry. The development and manufacture of closed cannabis oil vaporizer systems requires a lengthy research and development process, extensive and particular facilities and equipment, as well as exhaustive testing in bench samples and at scale. In particular, the production of closed cannabis oil vaporizer systems requires suitable manufacturing plants with appropriate equipment and advanced laboratories with specific equipment, including costly and unconventional machines and devices.

100.      The market for the distribution of unfilled vape cartridges for closed cannabis oil

vaporization systems is also marked by high barriers to entry. Distribution and marketing of closed cannabis vaporization systems is driven in significant part by personal relationships and point-of-sale promotions, posing further barriers to entry into this already concentrated market.

101.    Barriers to entry are further exacerbated in both markets by Smoore and Distributor Defendants' anticompetitive conduct which harms competition in the Relevant Markets. Defendants' minimum price floors, prohibitions from buying from rival manufacturers, and sham patent litigation against would-be competitors ensure that potential entrants are unable to manufacture the Products, distribute the Products, or access customers for the Products in the United States.

### 3.    *The Relevant Markets are inelastic*.

102.    The market demand for unfilled vape cartridges for closed cannabis oil vaporization systems are inelastic and susceptible to anticompetitive coordination by wholesale distributors and manufacturers. Due to the differences between cannabis delivery systems and core consumer preferences for closed cannabis vaporization systems, closed cannabis oil vaporizer systems are not responsive to price changes in other smokable or edible cannabis products.

103.    In the present case, Smoore is a monopolist in the manufacture of unfilled cartridges for closed cannabis oil vaporization systems and has used its market power and anticompetitive agreements with distributors to impose anticompetitive price floors on its Products. A small but significant non-transitory increase in price would not cause purchasers to substitute products. Despite this monopolistic conduct, cannabis oil producers and retail distributors that are consumers of Smoore's Products do not switch to alternative cannabis products or other products. Similarly, cannabis oil producers and retailers that are Smoore's customers do not alter their production processes to enter the market for manufacturing closed cannabis oil vaporization systems, nor do they have other suppliers that they can turn to fulfill the volume of the Products that they need. Instead, they are simply stuck paying the higher prices imposed by Smoore and the Distributor Defendants.

## VIII.   ANTICOMPETITVE CONDUCT

### A.   Defendants' Anticompetitive Distribution Agreements

104.    Smoore distributes its closed cannabis oil vaporizer systems and corresponding unfilled vape cartridge products both by selling directly to cannabis oil and extract producers and through Distributor Defendants. Smoore entered distribution agreements with the Distributor Defendants that contain provisions that restrain competition in the Relevant Markets and reinforce its monopoly power in the market for the manufacture and sale of unfilled vape cartridges for closed cannabis oil vaporization systems.

105.    Smoore imposes anticompetitive exclusivity provisions, horizontal price restraints, and vertical price restraints in its distribution agreements with the Distributor Defendants by restricting them from selling to Smoore's competitors or making any downstream sales below a price floor set by Smoore. Smoore enforces compliance with these anticompetitive arrangements by requiring the Distributor Defendants to post security deposits which it can take from in the event of non-compliance by any of the Distributor Defendants.

### 1.   *Smoore and Distributor Defendants agreed to exclusively sell Smoore's Products subject to minimum price restraints.*

106.    Since November 2016, Smoore and at least two of the Distributor Defendants agreed not to compete with one another in the wholesale distribution of CCELL vapes. Sometime in 2017, Distributor Defendant CB Solutions also joined the conspiracy, followed by KushCo. sometime in 2018. At some point, many of the terms of this illegal conspiracy were incorporated into distribution agreements, including a wholesale price floor for distributing Smoore's Products.

107.    Distributor Defendants are forbidden from selling competing products that compete with Smoore's Products in the Relevant Markets. Smoore and Distributor Defendants also agreed that they would not compete for at least some customers of one another, and in so doing, allocated the market for wholesale distribution of unfilled vape cartridges for closed cannabis vaporization systems amongst one another resulting in the elimination of price competition and competition for customers and sales volume.

108.     These anticompetitive agreements to refrain from competing also raise barriers to entry for potential entrants in the manufacturing market that would compete with Smoore's Products and cut off access to wholesale distribution in the United States, depriving potential entrants of access to a significant customer base of cannabis producers and retail distributors.

109.     Distributor Defendants are also prohibited from selling Smoore's products below a minimum price floor. Such agreements effectively require distributors to sell Smoore's products at prices at or above the prices at which Smoore—a direct competitor as well as supplier—sells its products. The result of the price floor on the market is the elimination of price competition below a certain threshold that is determined by the monopolist supplier of the Products, Smoore.

### 2.     *There were ample opportunities for Defendants to collude.*

110.     Smoore and the Distributor Defendants held in-person meetings in 2018 or 2019 in Los Angeles where Defendants discussed cooperating to restrain competition among themselves in the wholesale distribution market for closed cannabis oil vaporization systems.

111.     Participants in one or more such meeting(s) include Jupiter's Mark Scatterday (CEO), Joseph Barberio (COO) and/or Paul Stremcha (Head of Sales); 3Win's Chris Sinacori (CEO), and/or Eric Newman (Chief Sales Officer);  CB Solutions' Danny Allen (CEO); and/or Greenlane's/KushCo's Nick Kovacevich (CEO), Jim McCormick (CFO), Jason Manasse (VP of Business development), and/or Jason Vegotsky (President/VP of Sales).

112.     In 2018, Jupiter's COO, Joseph Barberio, met with the other Defendants and gave a presentation to them. A large banner shown at this meeting connected each of the Defendants' logos to a message of "Friendship"; "Understanding"; and "Joint Success."

113.     At one such meeting, Defendant Smoore's Head of North American Sales, Shallyn Lin was pictured together with CB Solutions CEO, Danny Allen. Defendant 3Win's CEO, Chris Sinacori. Meetings and social connections of this kind between competitors provide ample opportunity to collude on price and other terms of competition, as has been recognized by both courts and the antitrust agencies.

### 3. *Smoore and Distributor Defendants agreed to share information on pricing and confidential customer information.*

114. Reports suggest that Defendants' distribution agreements provided for information sharing and facilitating practices that are essential to discipline competitive market behavior in a price-fixing scheme. Distributor Defendants were obligated to report pricing information and confidential client information or customer names to Smoore on a monthly basis.

115. Distributor Defendants were regularly called upon to report any deviations from the anticompetitive distribution scheme to Smoore, including attempts by any distributor to sell below the agreed minimum wholesale price floor or any attempted solicitation of any of the other Distributor Defendants' customers.

### 4. *Smoore policed and enforced the anticompetitive distribution scheme by assessing monetary penalties to noncompliant distributors.*

116. Smoore would discipline non-compliant Distributor Defendants that attempted to sell the Products below the price floor or solicit customers that were allocated to Smoore or another Distributor Defendant by taking money from a security deposit that each Distributor Defendant was required to post in connection with their distribution agreements. This enforcement mechanism, together with the active monitoring, supervision, and reporting requirements under the agreement ensured that no distributor could undercut the agreement not to compete on prices or compete for each other's customers.

### B. Smoore Excludes Competition in the Relevant Market for Distribution Through Exclusivity Agreements.

117. In addition to keeping market prices for the Products elevated at supracompetitive levels, the exclusivity provisions of the distribution agreements that Smoore entered into with the Distributor Defendants also served to reinforce Smoore's primary monopoly in manufacturing the Products. Smoore along with the Distributor Defendants' control at minimum 65% of the wholesale distribution market and likely control much more. The provisions of the distribution agreements and other agreements that the Distributor Defendants would not sell products that

competed with Smoore's Products denied any would be competitor access to the vast distribution network in the United States and cut them off from potential customers. This market foreclosure of the wholesale distribution market for closed cannabis oil vaporization systems served to reinforce Smoore's monopoly position in the manufacture of those same products.

### C. Smoore Excludes Competition in the Relevant Market for Manufacturing by Filing Sham Patent Litigation.

118. Defendant Smoore also defends its primary monopoly in the manufacture and sale of cannabis vaping cartridge Products and exclude rival manufacturers of the Products by filing frivolous patent litigation against would-be competitors in the manufacture and sale of competing vaping cartridge products.

119. In 2021, the International Trade Commission determined that Smoore obtained a related patent through fraud, failed to supply sufficient evidence of patent infringement, and even knowingly made false declarations in connection with several allegedly infringed patents. *Certain Oil-Vaping Cartridges, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1286 (86 Fed. Reg. 62567-69).

120. Smoore's purpose of filing these patent infringement claims was to exclude rival cannabis vaping cartridge manufacturers from entering the market. Smoore continues to file patent infringement lawsuits against would-be competitors based on many of the same patents the International Trade Commission determined were not infringed upon.

## IX. ANTICOMPETITIVE EFFECTS

121. Defendants' anticompetitive scheme prevented entry by rival manufacturers of the products, enabled Defendants to charge supracompetitive prices, and reduced the available supply of the Products in the market leading to an overall reduction in output. As a result, cannabis oil producers and other purchasers of cannabis vape cartridges paid higher prices for closed cannabis oil vaporizer system than they otherwise would have absent these agreements. This is exactly the type of anticompetitive harm the antitrust laws are designed to remedy.

A.    **Defendant's Anticompetitive Agreement Harmed the Competitive Process.**

122.    The alleged conduct harmed competition by reduced price competition in the Relevant Markets for the Products, resulted in fewer competitors in the Relevant Markets due to exclusionary conduct and high barriers to entry, and throttled the incentive to innovate, leading to poorer quality cannabis vaping devices for end-consumers. The reduction in price competition, allocation of customers, and foreclosure of competition in the manufacturing market all resulted in significant harms to the competitive process.

B.    **Defendants' Anticompetitive Agreement Harmed Consumers.**

123.    Defendants' anticompetitive conduct also harms end-consumers that paid higher prices for closed cannabis vaporization systems due to lack of price competition and likely purchased lower quality devices.

124.    Further, consumers' product options are limited as a result of market foreclosure in the manufacture of the products since Smoore had little incentive to innovate or respond to consumer preferences.

C.    **Smoore's Agreements with the Distributor Defendants Excluded Competition and Reinforced its Monopoly Position.**

125.    In one case, NLV, a company that manufactured competing products and distributed through Distributor Defendant Greenlane was terminated at the behest of Smoore. This eliminated an crucial wholesale distribution channel for NLV and cut it off from a host of retail consumers and cannabis producers that would have purchased NLV's competing products.

## X.    CLASS ACTION ALLEGATIONS

126.    Plaintiff brings this action on behalf of themselves, under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2), as representative of a class of indirect purchasers seeking injunctive relief ("Nationwide Relief Class") defined as follows:

> All indirect purchaser, end-user consumers in the United States who purchased CCELL closed cannabis oil vaporization products, cartridges, component parts or all-in-one devices initially designed and manufactured by Smoore from a licensed dispensary or other retailer from January 1, 2016 through the present day or, alternatively, during the statutory period ("Class Period").

127. Plaintiff also brings this action under Federal Rules of Civil Procedure 23(a) and (b)(3), as representative of a class seeking damages for violations of various state antitrust and consumer protection laws ("State Law Damages Class") defined as follows:

> All indirect purchaser, end-user consumers in the state or commonwealth of Arizona, California, Connecticut, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Nebraska Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia and Wisconsin and any other unnamed United States indirect purchaser jurisdictions who purchased CCELL closed cannabis oil vaporization products, cartridges, component parts or all-in-one devices initially designed and manufactured by Smoore from a licensed dispensary or other retailer from January 1, 2016 through the present day or, alternatively, during the statutory period ("Class Period").

128. Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; defendants' attorneys in this case, federal government entities and instrumentalities, states or their subdivisions, and all judges and jurors assigned to this case.

129. Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

130. The members of the Classes are so numerous and geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to join their individual claims. Although the precise number of such individuals is unknown to Plaintiff, Plaintiff believes that the number of members in the Classes are in the hundreds of thousands or more, and that the members reside or are located throughout the United States, including in this District.

131. Plaintiff's claims are typical of the members of the Classes. Plaintiff and all members of the Classes were injured by the same wrongful conduct by Defendants. Defendants' anticompetitive conduct deprived the members of the Classes of the benefits of competition from less expensive cannabis oil vaporization products, cartridges, component parts or all-in-one

devices causing them to pay artificially inflated, supracompetitive prices.

132.     Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiff are aligned with, and not antagonistic to, those of the other Class members.

133.     Common questions of law and fact exist as to all members of the Classes. Defendants' anticompetitive conspiracy commonly implicated and was generally applicable to all the Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

a.   whether Defendants engaged in a conspiracy in violation of the antitrust laws;

b.   whether Defendants entered into a horizontal agreement in restraint of trade;

c.   whether Smoore entered into vertical agreements with other Defendants in restraint of trade

d.   the duration of Defendants' anticompetitive conduct;

e.   whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and members of the Classes

f.   whether the market for CCELL closed cannabis oil vaporization products, cartridges, component parts or all-in-one devices is an appropriate relevant markets for analyzing the claims in this case;

g.   whether the relevant geographic market is the United States;

h.   whether Defendants conspired or agreed to illegally set minimum prices for CCELL closed cannabis oil vaporization products, cartridges, component parts or all-in-one devices, and whether it is an appropriate relevant market for analyzing the claims in this case

i.   whether Smoore possesses market power in the Relevant Markets;

j.   whether Defendants engaged in overt acts furthering their agreement to

28

fix prices in the Relevant Markets;

k. whether Defendants engaged in unfair methods of competition, and unfair and deceptive acts, in violation of state consumer protection laws;

l. whether Defendants' conspiracy and agreements had anticompetitive effects in the Relevant Markets;

m. whether Defendants' actions alleged herein caused injury to Plaintiff and the Class members by causing them to pay artificially inflated prices in the Relevant Markets during the Class Period;

n. the appropriate measure of damages; and

o. the propriety of declaratory and injunctive relief.

134. These and other questions of law and fact are common to the Class members and predominate over any questions affecting Class members individually.

135. Plaintiff is more than an adequate representative of the Classes, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiff has the incentive and is committed to prosecuting this action for the benefit of the Classes. Plaintiff has no interests that are antagonistic to those of the Classes. Plaintiff has retained counsel highly experienced in antitrust and class action litigation.

136. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

137. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XI.    TOLLING OF STATUTE OF LIMITATIONS

### A.    Plaintiff Could Not Have Discovered Their Injury Within Four Years of Filing.

138.    Plaintiff and members of the putative Classes had neither actual nor constructive knowledge, and no reason to believe, that they paid prices for CCELL closed cannabis oil vaporization products, cartridges, component parts or all-in-one devices that were affected by Defendants' illegal conduct in the four years prior to their initiating the present litigation.

139.    By its very nature, the alleged misconduct of Defendants was self-concealing. The Distribution Agreements, internal communications, and monitoring and enforcement mechanisms between Defendants were not public information, rendering any ascertainment of their specific misconduct impossible.

### B.    Defendants Fraudulently Concealed Their Anticompetitive Agreement.

140.    Defendants fraudulently concealed their scheme by not disclosing their anticompetitive agreement.

141.    A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence, if a plaintiff can show an affirmatively misleading act by the concealing defendant.

142.    Such an affirmative act is present here.  In the June 29, 2020 Global Offering memorandum—Smoore's parent inaccurately represented that Smoore's distributors had autonomy over their pricing decisions:

> We generally sell our products to distributors at around 34% to 43% of the retail price *recommended* by us. The prices at which we sell our products to the distributors are determined on a cost-plus basis. We will offer different levels of discounts to distributors based on their distributorship types and sales network coverage on a case-by-case basis. We *provide guidance regarding price range* as well as product promotional discount policies and programs to our distributors according to their tier. Our *distributors should follow our guidance and formulate the final selling price based on their operational performance*.

143. This assertion was false and materially misleading because the true facts were that Defendants agreed that pricing to DPPs and members of the putative Class and Sub-Class were set by agreement rather than unilaterally.

144. Defendants further fraudulently concealed their anticompetitive agreement by offering pretextual explanations for the pricing of their Vapes. For example, Smoore has claimed that CCELL-branded Vapes are more expensive than competitors' Vapes because they are better products, and Defendant 3Win claims on its website that CCELL-branded Vapes are expensive because they "are of the highest standard and quality in the industry." These public-facing explanations for the higher prices for CCELL-branded Vapes fraudulently concealed the true reason they were more expensive: Defendants' anticompetitive conduct.

145. Defendants communicated secretly, including by email, to avoid public disclosure of their anticompetitive conduct.

## C.     The Continuing Violation Doctrine Applies.

146. In the alternative, Plaintiff and Class members are entitled to toll the statute of limitations based on the continuing violations doctrine until they were on notice of their claims through the first filed claims against Defendants based on this conspiracy. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (2014) ("Turning first to the continuing violation exception, the Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act.").

**FIRST CLAIM FOR RELIEF**
**For Injunctive Relief Under Section 16 of the Clayton Act for**
**Violations of Sections 1, 2 and 3 of the Sherman Act, 15 U.S.C. §§ 1-3**
**(On Behalf of Plaintiff and the Nationwide Relief Class)**

147. Plaintiff incorporates the above paragraphs by reference.

148. The Relevant Markets are the markets for the manufacture and distribution of CCELL closed cannabis oil vaporization products, cartridges, component parts or all-in-one devices in the United States.

149.    Beginning sometime before but not later than January 1, 2019 (the "Conspiracy Period"), Smoore and the Distributor Defendants entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1, 2 and 3 of the Sherman Act by artificially reducing or eliminating competition for the pricing of closed cannabis oil vaporizer systems products sold indirectly to United States consumers.

150.    Smoore is a monopolist in the manufacture and sale of the closed cannabis oil vaporization products, cartridges, component parts or all-in-one devices in the United States as it produces as much as 80% of the closed cannabis oil vaping devices in the United States and sells the Products directly to cannabis producers and to the Distributor Defendants pursuant to distribution agreements.

151.    Smoore's distribution agreements with the other Defendants constitute contract combination or conspiracy in restraint of trade that were entered into for the purpose of raising, fix, maintain or stabilize the prices of closed cannabis oil vaporizer system products sold to indirect purchasers in the United States during the Conspiracy Period, and to further cement Smoore's dominance in the market by excluding competition.

152.    Smoore's distribution agreements for CCELL products include illegal exclusivity agreements which forbids distributors from selling competing products, mandatory price restraints that require distributors sell downstream at prices set by Smoore, banned competition whereby Smoore's distributors are banned from selling Smoore's products to Smoore's competitors and the collection of security deposits on sales to penalize distributors who do not comply with Smoore's pricing restraints.

153.    These restrictions foreclose market entry for smaller entrants, fix prices vertically for downstream purchasers (leading to higher, fixed, or stabilized prices for end-consumers), harm both intra-brand and inter-brand competition in the Relevant Market and, because Smoore sells its products directly to consumers, horizontally restrains competition between Smoore and Smoore's distributors (the Distributor Defendants). This conduct has the effect of fixing prices in the Relevant Market leading to higher prices for Plaintiff and other indirect consumers, poorer quality

and less safe products, throttled innovation and a lack of inter-brand and intra-brand competition.

154.     As a result of the Defendants' unlawful conduct and acts taken in furtherance of the conspiracy, prices for closed cannabis oil vaporizer system products sold to indirect purchasers in the United States were raised, fixed, maintained or stabilized at artificially inflated levels.

155.     Given the inelastic nature of the Relevant Market, all of the excessive supracompetitive pricing Defendants were able to extract from the Relevant Market was passed through to Plaintiff and members of the Injunctive Relief Class by cannabis oil companies and other intermediaries from whom consumers like the Plaintiff purchased closed cannabis oil vaping devices and cartridges.

156.     Plaintiff and the Injunctive Relief Class have suffered antitrust injury and damages as a result of Defendants' unlawful conduct. Plaintiff and Class member's injuries include paying supracompetitive prices for products in the Relevant Markets and, as such, Plaintiff and Class members seek declaratory and injunctive relief under this Count.

157.     Plaintiff and members of the Injunctive Relief Class will continue to suffer injury, in the form of paying artificially inflated prices indirectly to Defendants if their unlawful conduct is not enjoined.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust Law**
**(On Behalf of Plaintiff and the State Law Damages Class)**

158.     Plaintiff incorporates the above paragraphs by reference.

159.     In addition to violating Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act, Defendants also violated state (and district) antitrust laws by: (1) engaged in restraints of trade in agreeing to allow Smoore to set prices; (2) utilizing "security deposits" to enforce the agreement; and (3) utilizing exclusionary agreements that foreclosed competition and maintained Smoore's dominance over the Relevant Markets.

160.     By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in contracts, combinations and a conspiracy to restrain trade in violation of the following

state antitrust laws:

a. **Arizona**. Ariz. Rev. Stat. §§ 44-1402, *et seq*., with respect to purchases of Defendants' products in Arizona by Class members and/or by Arizona residents. During the Class Period, Defendants' illegal conduct substantially impacted Arizona's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

b. **California**. Cal. Bus. And Prof. Code §§ 16720, *et seq.*, with respect to purchases of Defendants' products in California by Class members and/or by California residents. During the Class Period, Defendants' illegal conduct substantially impacted California's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute including treble damages and reasonable attorneys' fees.

c. **Connecticut.** Conn. Gen. Stat. § 35-24, *et seq.*, with respect to purchases of Defendants' products in Connecticut by Class members and/or by Connecticut residents. During the Class Period, Defendants' illegal conduct substantially impacted Connecticut's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

d. **District of Columbia**. D.C. Code §§ 28-4502, *et seq*., with respect to purchases of Defendants' products and services in the District of Columbia by Class members and/or by District of Columbia residents. During the Class Period, Defendants' illegal conduct substantially impacted the District of Columbia's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

e. **Florida**. Fla. Stat. § 501.201, *et seq*. with respect to purchases of Defendants' products and services in Florida by Class members and/or by Florisa residents. During the Class Period, Defendants' illegal conduct substantially impacted Florida's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

f. **Hawaii**. Haw. Rev. Stat §§ 480-1, *et seq*., with respect to purchases of Defendants' products and services in Hawaii by Class members and/or by Hawaii residents. During the Class Period, Defendants' illegal conduct substantially impacted Hawaii's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

g. **Illinois**. 740 Ill. Comp. Stat. Ann. 10/1, *et seq.* with respect to purchases of Defendants' products and services in Illinois by Class members and/or by Illinois residents. During the Class Period, Defendants' illegal conduct substantially impacted Illinois's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

h. **Iowa**. Iowa Code §§ 553.4, *et seq.*, with respect to purchases of Defendants' products and services in Iowa by Class members and/or by Iowa residents. During the Class Period, Defendants' illegal conduct substantially impacted Iowa's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

i. **Kansas**. Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Defendants' products and services in Kansas by Class members and/or by Kansas residents. During the Class Period, Defendants' illegal conduct substantially impacted Kansas's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

j. **Maine**. Me. Stat. tit. 10 §§ 1101, *et seq.*, with respect to purchases of Defendants' products and services in Maine by Class members and/or by Maine residents. During the Class Period, Defendants' illegal conduct substantially impacted Maine's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

k. **Maryland**. Md. Code, Com Law, §§ 11-204, *et seq.*, with respect to purchases of Defendants' products and services in Maryland by Class members and/or by Maryland residents. During the Class Period, Defendants' illegal conduct substantially impacted Maryland's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

l. **Michigan**. Mich. Comp. Laws §§ 445.772, *et seq.*, with respect to purchases of Defendants' products and services in Michigan by Class members and/or by Michigan residents. During the Class Period, Defendants' illegal conduct substantially impacted Michigan's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

m. **Minnesota**. Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of Defendants' products and services in Minnesota by Class members and/or by Minnesota residents. During the Class Period, Defendants' illegal conduct substantially impacted Minnesota's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

n. **Mississippi**. Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Defendants' products and services in Mississippi by Class members and/or by Mississippi residents. During the Class Period, Defendants' illegal conduct substantially impacted Mississippi's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

o. **Nebraska**. Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of Defendants' products and services in Nebraska by Class members and/or by Nebraska residents. During the Class Period, Defendants' illegal conduct substantially impacted Nebraska's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

p. **Nevada**. Nev. Rev. Stat. §§ 598A.060, *et seq.*, with respect to purchases of Defendants' products and services in Nevada by Class members and/or by Nevada residents. During the Class Period, Defendants' illegal conduct substantially impacted Nevada's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

q. **New Hampshire**. N.H. Rev. Stat. Ann. §§ 356:2, *et seq.*, with respect to purchases of Defendants' products and services in New Hampshire by Class members and/or by New Hampshire residents. During the Class Period, Defendants' illegal conduct substantially impacted New Hampshire's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

r. **New Mexico**. N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Defendants' products and service During the Class Period, Defendants' illegal conduct

substantially impacted New Mexico's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

s. **New York**. N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Defendants' products and services in New York by Class members and/or by New York residents. During the Class Period, Defendants' illegal conduct substantially impacted New York's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

t. **North Carolina**. N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Defendants' products and services in North Carolina by Class members and/or by North Carolina residents. During the Class Period, Defendants' illegal conduct substantially impacted North Carolina's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

u. **North Dakota.** N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Defendants' products and services in North Dakota by Class members and/or by North Dakota residents. During the Class Period, Defendants' illegal conduct substantially impacted North Dakota's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

v. **Oregon**. Or. Rev. Stat. §§ 646.725, *et seq.*, with respect to purchases of Defendants' products and services in Oregon by Class members and/or by Oregon residents. During the Class Period, Defendants' illegal conduct substantially impacted Oregon's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

w. **Puerto Rico**. P.R. Laws Title 10 §§ 260, *et seq.* with respect to purchases of Defendants' products and services in Puerto Rico by Class members and/or by Puerto Rico residents. During the Class Period, Defendants' illegal conduct substantially impacted Puerto Rico's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

x. **Rhode Island.** R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases of

Defendants' products and services in Rhode Island by Class members and/or by Rhode Island residents. During the Class Period, Defendants' illegal conduct substantially impacted Rhode Island's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

 y. **South Dakota** S.D. Codified Laws §§ 37-1-3.1, *et seq*., with respect to purchases of Defendants' products and services in South Dakota by Class members and/or by South Dakota residents. During the Class Period, Defendants' illegal conduct substantially impacted South Dakota's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

 z. **Tennessee**. Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases of Defendants' products and services in Tennessee by Class members and/or by Tennessee residents. During the Class Period, Defendants' illegal conduct substantially impacted Tennessee's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

 aa. **Utah**. Utah Code Ann. §§ 76-10-3104, *et seq*., with respect to purchases of Defendants' products and services in Utah by Class members and/or by Utah residents. During the Class Period, Defendants' illegal conduct substantially impacted Utah's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

 bb. **West Virginia**. W. Va. Code §§ 47-18-1, *et seq*., with respect to purchases of Defendants' products and services in West Virginia by Class members and/or by West Virginia residents. During the Class Period, Defendants' illegal conduct substantially impacted West Virginia's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

 cc. **Wisconsin**. Wis. Stat. §§ 133.03, *et seq*., with respect to purchases of Defendants' products and services in Wisconsin by Class members and/or by Wisconsin residents. During the Class Period, Defendants' illegal conduct substantially impacted Wisconsin's commerce. Accordingly, Plaintiff and Class members seek all forms of relief available under this statute.

161.    Under the laws of each of these states, territories and districts, indirect purchasers have standing under the antitrust and consumer protection statutes to maintain an action based on the facts alleged in this Complaint.

162.    Plaintiff and members of the State Law Damages Class have been injured by reason of Defendants' antitrust violations alleged in this Complaint. Their injuries consist of paying higher prices than they would have paid in the absence of Defendants' conduct. These injuries are of the type that the foregoing laws are intended to prevent, and flow from that which makes Defendants' conduct unlawful.

163.    Plaintiff and the State Law Damages Class seek damages, multiple damages, costs and reasonable attorneys' fees as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

### THIRD CLAIM FOR RELIEF
**For Declaratory Relief Under 28 U.S.C. § 2201 for Violations of
Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1–3
(On Behalf of Plaintiff and the Nationwide Relief Class)**

164.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

165.    Plaintiff and the members of the Nationwide Relief Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 and 2 of the Sherman Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the proposed Classes, pray for judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action pursuant to Rules 23(a), 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the members of the Classes, and appoint the Plaintiff as the named representatives of the Classes;

B.      Awarding Plaintiff and the Class treble damages in an amount to be determined in trial, plus interest in accordance with law;

C.      Entering joint and several judgments against each Defendant in favor of Plaintiff and the Classes;

D.      Granting Plaintiff and the Classes equitable relief in the form of disgorgement;

E.      Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

F.      Awarding such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(c), Plaintiff demands a trial by jury on all issues so triable.


Dated:  July 2, 2025                                          Respectfully Submitted,


By:      *Russell Busch*

Russell Busch
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe St., Suite 2100
Chicago, Illinois 60606
Tel: (630) 796-0903
rbusch@milberg.com


Nick Suciu III
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Trenton Kashima (SBN No. 291405)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
401 West Broadway, Suite 1760
San Diego, CA 92101
Tel: (212) 946-8389
tkashima@milberg.com

*Counsel for Plaintiff B.Z.*